UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID PORTER et al.,

    Plaintiffs,

-vs-

                                    Case No. 07-14507
                                    HON. AVERN COHN

CITY OF FLINT

    and

DONALD WILLIAMSON,

    Defendants.

_____/

**MEMORANDUM AND ORDER DENYING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

This is a racial discrimination case. Forty-five white police officers (collectively plaintiffs) complain in six consolidated cases that the City of Flint and Mayor Donald Williamson (Williamson) (collectively defendants) unlawfully discriminated against them when Williamson personally selected officers on the basis of race to serve on a newly formed Citizens' Service Bureau (CSB).[1]  Plaintiffs bring suit under Michigan's Elliott-Larsen Civil Rights Act (ELCRA), M.C.L. § 37.2202, and the Civil Rights Act, 42. U.S.C. § 1983. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and 42 U.S.C. § 1343 and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

---

[1] At the time of the events in question, 16 plaintiffs held the rank of Patrol Officer, 19 the rank of Sergeant, seven the rank of Lieutenant, and three the rank of Captain.

The Complaint is in two counts: (I) defendants' violation of ELCRA under M.C.L. § 37.2202; and (II) Williamson's violation of plaintiffs' Equal Protection rights under 42 U.S.C. § 1983.

Before the Court is defendants' motion for summary judgment. For the reasons that follow, the motion is DENIED.

## II.  FACTS

The facts are taken from the parties' pleadings and exhibits, including deposition testimony of Williamson; Gary Hagler (Hagler), former police chief; Deirdre Pitts (Pitts), director of Human Resources and Labor Relations for the City of Flint; David Dicks (Dicks), former CSB Inspector; and Bryn Mickle, afternoon police reporter for the *Flint Journal*.

### A.  Background to the CSB

Flint has been plagued by a high crime rate. In 2006, the city ranked as the third most dangerous in the United States. Based on his interaction with the community, Williamson sensed a growing perception of apathy in the police department, public dissatisfaction with police response times, and a lack of rapport between police officers and the community. In February 2006, he declared a "war on criminals" in response to a wave of homicides and included plans in his State of the City address to reopen the City Jail and hire more police officers.

#### 1.  City Council Rejects Williamson's "Save Our City" Plan

In August 2006, Williamson announced the "Save Our City" plan, in which he proposed hiring 50 new police officers, purchasing 40 additional police vehicles, increasing police presence on the streets, and re-opening the city jail.

Flint's City Council did not approve the Mayor's plan. Williamson considered other options and concluded that the Police Department needed restructuring so that he could put more officers on the street and improve the response time to 911 calls.

### 2. The Police Officers' Association Challenges Williamson's "26-Point" Plan

Williamson proposed a 26-point plan that would, among other things: (1) require one-half of all Sergeants, Lieutenants, and Captains be put on patrol; (2) require patrol cars be manned by one officer instead of two; and (3) impose an audit of how officers spend their time. In response, the Flint Police Officers Association (POA) filed suit.

### 3. NAACP and AAPL Voice Concerns

Also in the summer of 2006, the Flint Branch of the National Association for the Advancement of Colored People (NAACP) and the Flint Afro-American Police League (AAPL) voiced concerns over the small number of minorities in command positions within the police department. The same issue was raised at a mediation between the NAACP and the City. The *Flint Journal* reported on AAPL's position that there were not enough African Americans in command positions.

On October 26, 2006, the Department of Justice's Community Relations Service set up a meeting among the City, the NAACP, AAPL, and the POA. Hagler, police chief at the time, testified that the issues discussed included diversity, the number of minorities in command positions, equipment, and shifts. Representatives of all parties signed a Memorandum of Understanding and Mutual Support (Memorandum of

Understanding). Williamson rescinded his 26-point plan and the POA dropped its lawsuit.

At a press conference discussing the Memorandum of Understanding, AAPL president Terry Neeley reiterated his desire for more "Blacks in higher command structure."

### B.  Williamson Creates the CSB

Shortly after the October 26 meeting, Williamson directed Hagler to establish the CSB on an experimental basis. Williamson's stated goals for the CSB were: (1) heightening citizen awareness of their role in fighting crime; (2) establishing and maintaining a high level of close citizen relationships with uniformed police officers; and (3) expanding the eyes and ears of the police department through an organized and watchful Flint citizenry. Job descriptions were drawn up on October 31, 2006.

### C.  Williamson Announces Creation of the CSB

At a press conference on December 1, 2006, Williamson announced the creation of the CSB. Four times in the press release prepared for the event Williamson referred to the CSB as a "[new] command structure."

### D.  Williamson Staffs the CSB

There were five provisional positions to be filled in the CSB: one Major and four Inspectors. The positions were not posted, no applications were taken, and no promotional examinations were administered. Pitts testified that she provided Williamson with a list of all officers who had 10, 15, and 20 years of service. The list

4

included an "ethnic code" for each officer, identifying his or her race; the other fields on the list were name, grade, sex, and hire date.

Williamson personally chose all members of the CSB from the list. Pitts said she encouraged Williamson to keep diversity in mind and she believed race played a part in his selections. Williamson testified, "We wanted to pick as equal as we could black to whites when we did this. And we did."

Williamson contacted his first choices and some accepted the position. Two who rejected offers were David Bender and Harold Dumanois, both Caucasian males.

In an executive order dated December 4, 2006, Williamson appointed officer John Keahey (Keahey) to the Major position, and officers Connie Johnson (Johnson), David Dicks (Dicks), Ralph Tedford, and Houston Tipton (Tipton) to the Inspector positions. With the exception of Johnson, a Caucasian female, all the officers appointed are African American males.

Williamson announced the five members of the CSB in a press release on December 6, 2006, in which he again referred to the CSB as a command structure. In the press release, however, Tipton was replaced by Jermaine Reese, also an African American male.

On December 26, 2006, Dicks recounted in an officer's report how he came to serve on the CSB. He said he received a call at home from Human Resources on December 4, 2006, notifying him of his provisional appointment to the rank of Inspector, with the chain of command to be Major Keahey, Chief Hagler, and Mayor Williamson. He also said that "the title given was said to outrank Captains, Lieutenants and

5

Sergeants within this police department." In deposition, Dicks testified that all his statements in the report were truthful and accurate.

### E.  Plaintiffs File Unfair Labor Charge

In response to Williamson's announcement, plaintiffs and their unions filed class action grievances claiming that the appointments violated their respective collective bargaining agreements. Their grievances were denied because their labor contracts did not prohibit the City from making the appointments.

Plaintiffs, along with more than one hundred other male and female Flint Police Officers, Caucasian and African American alike, filed an Unfair Labor Charge with the Michigan Employment Relations Commission (MERC) in early 2007. On May 21, 2008, the ALJ issued a Decision and Recommended Order in which, among other things, she found:

> Respondent asserts that it had the right to appoint these individuals to these positions without following established promotional procedures or bargaining with Charging Parties over a different procedure because, first, the appointments were only temporary, and second, the major and inspector jobs did not involve "typical, bargained for, police department type work." The major and inspectors, however, were not appointed for a fixed term. Nothing other than the labeling of their appointments as provisional in their employment contracts indicates that their appointments are temporary.
>
> I also see no merit to Respondent's argument that it had no obligation to bargain with Charging Parties before departing from established promotional procedures because the major and inspector positions were not in the regular chain of command. The major and inspectors are paid more than all sergeants and some captains and lieutenants. They also carry ranks that, within a paramilitary organization like the department, indicate authority and prestige. Clearly, these positions represented an opportunity for advancement for Charging Parties' members even if they did not directly command sergeants, lieutenants or captains. I conclude that Respondent had an obligation to

follow established promotional procedures in appointing individuals to the new ranks.

The ALJ's findings have not been finalized by MERC and the City is appealing the ruling.[2]

### F. CSB Operations Are Suspended

Plaintiffs filed suit in federal district court in October 2007. In spring 2008, CSB operations were suspended due to budgetary constraints and former CSB members were reintegrated into the regular police force.

### III. LEGAL STANDARD

Summary judgment is appropriate when the evidence submitted shows that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A party claiming relief may move, with or without supporting affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(a). Accordingly, the movant bears the initial responsibility of informing the court of the basis for its motion, and identifying what it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When a motion for summary judgment is properly made and supported, an opposing party must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). All facts and inferences should be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970).

---

[2] While a state administrative agency's findings have no preclusive effect on later discrimination litigation in federal court, the findings are admissible at trial. Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 113–14 (1991).

## IV. ANALYSIS

Employment discrimination claims brought under 42. U.S.C. § 1983 and ELCRA are analyzed under the Title VII evidentiary framework. Warfield v. Lebanon Corr. Inst., 181 F.3d 723, 728–29 (6th Cir. 1999) (applying Title VII and § 1983); Hazle v. Ford Motor Co., 464 Mich. 456, 463–64 (2001) (applying ELCRA).

### 1. Direct Evidence

Plaintiffs have proffered direct evidence of employment discrimination on the basis of race. Direct evidence of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Schering-Plough Healthcare Products Sales Corp., 176 F.3d 921, 926 (6th Cir. 1999).

Williamson and Pitts testified that race was a factor in Williamson's selections of officers to fill the CSB positions. Williamson's testimony that "[w]e wanted to pick as equal as we could black to whites when we did this" is enough to overcome summary judgment and send the case to a jury. This facial intent to discriminate with a "goal" or "quota" is precisely what the Supreme Court has forbidden under the Fourteenth Amendment in Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 287–320 (1978) (in the context of university admissions).[3]

### B. Circumstantial Evidence

---

[3] Defendants seriously misunderstand or misstate the record when they assert that Williamson testified that he did not know the race of the individuals selected. What Williamson said was that he did not know the race of the "persons who *didn't* take the job initially during the first selection" (emphasis added)—in other words, he did not know the race of the individuals who turned down the job when it was offered to them. This is clear from his actual words as well as the context of his testimony.

Even if Williamson's deposition testimony was not considered direct evidence, plaintiffs have produced probative circumstantial evidence of unlawful discrimination. Under the McDonnell Douglas-Burdine burden-shifting framework for Title VII employment discrimination, plaintiffs bear the initial burden of submitting evidence to support a prima facie case. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53 (1981); see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Plaintiffs must produce evidence that the City's conduct was racially motivated. Wilson v. Stroh Cos., 952 F.2d 942, 945 (6th Cir. 1992). If plaintiffs establish a prima facie case, defendants must articulate a legitimate, non-discriminatory reason for Williamson's action. McDonnell Douglas, 411 U.S. at 802. If defendants are successful, plaintiffs may still prevail if they establish that the apparently non-discriminatory rationale was merely a pretext for discrimination. Burdine, 450 U.S. at 256.

The Sixth Circuit applies a four-prong test to a case where a member of the racial majority is bringing a claim for discrimination: (1) the plaintiff can show background circumstances demonstrating that the defendant is the unusual employer who discriminates against the majority; (2) the plaintiff was qualified for the position at issue; (3) despite the plaintiff's qualifications, plaintiff was not promoted; and (4) a minority employee of similar qualifications was promoted. Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 67 (6th Cir. 1985).

First, any policy aimed at balancing racial diversity constitutes evidence that Flint may be the type of "unusual employer" that discriminates against the majority. See Comiskey v. Auto. Indus. Action Group, 40 F. Supp. 2d 877, 892 (E.D. Mich. 1999); see also Bishopp v. District of Columbia, 788 F.2d 781 (D.C. Cir. 1986) (defendant

9

promoted less qualified minority employee through use of subjective rather than objective criteria in response to internal and external pressure to favor minorities); Lanphear v. Prokop, 703 F.2d 1311 (D.C. Cir. 1983) (qualified white passed over for black whose qualifications were not fully checked due to pressure to increase minority percentages).  Plaintiffs have proffered evidence of background circumstances demonstrating that Flint may be the "unusual employer": (1) Williamson's hiring policy for the CSB ensured that race was a factor in his decision; (2) the creation of the CSB immediately followed the Memorandum of Understanding into which the NAACP, AAPL, the POA, and the City entered; and (3) the press release that referred four times to the newly created CSB as a "command structure" followed the complaint by AAPL that there were not enough African Americans in a "higher command structure."

Second, plaintiffs have adduced evidence establishing that they were qualified for the CSB positions based upon Williamson's published criteria.  Williamson wanted applicants with at least ten years of experience for Inspector and 15 years for Major who (1) could get along with the community and (2) knew the community.  Pitts gave him a list of all Flint police officers with name, grade, sex, ethnic group, and hire date.  No other data were included.  No performance histories were provided.  No job postings, applications, or examinations were involved.  Defendants have proffered no evidence to show that plaintiffs were not qualified for the positions.

Third, it is undisputed that Williamson did not select any of the plaintiffs for any of the positions.  Defendants say the CSB positions were not promotions.  However, it appears that the positions carried additional benefits and prestige.  Dicks was told by Human Resources that his position outranked Captains, Lieutenants, and Sergeants.

The ALJ found that Majors and Inspectors were paid more than Patrol Officers, Sergeants, and some Captains. The ALJ also found that the Major and Inspector ranks represented an opportunity for advancement for members of the Flint Police Department. This is all probative evidence that the CSB positions represented promotional opportunities.

Fourth, Williamson promoted African American officers, members of a minority, to four of the five the positions.

Defendants say that even if plaintiffs could establish a prima facie case, they did not suffer an adverse employment action because the CSB appointees have been reintegrated back in to the regular police force at their original ranks. Regardless of the ultimate fate of the CSB and the appointees, however, defendants' initial failure to select plaintiffs is evidence of an adverse employment action in the form of failure to promote.

Lastly, defendants say that Williamson was determined to address the high crime rate in Flint and that he wanted experienced patrol officers with an enhanced connection to the City. However, plaintiffs have proffered substantial probative evidence to rebut defendants' explanation as pretext with Williamson's own words: "We wanted to pick as equal as we could black to whites when we did this. And we did."

### V. CONCLUSION

This case must go to trial on liability. However, if liability is established there is still a considerable problem with the case in establishing damages. It would appear that each plaintiff was not damaged to the same extent, if at all, either economically or non-economically. There is nothing in plaintiffs' papers to offer any insight into how they intend to establish damages should they prevail on liability. Accordingly the Court will

bifurcate liability from damages and liability will go to trial first. If the finder of fact finds defendants guilty of discrimination, the case will then go forward on damages in a separate trial. Not clear at this point is the framework for such a damages trial involving 45 plaintiffs with potentially varying degrees of injury and hence damages.

    SO ORDERED.


Dated: May 19, 2009                s/Avern Cohn
                                        AVERN COHN
                                        UNITED STATES DISTRICT JUDGE